# UNITED STATES DISTRICT COURT

## NORTHERN _____ DISTRICT OF _____ ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

**FILED**
7-22-08
JN
JUL 2 2 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

v.

MICHAEL J. CIANCIO

(Name and Address of Defendant)

**UNDER SEAL**

CRIMINAL COMPLAINT

08 CR 580

CASE NUMBER: MAGISTRATE JUDGE MASON

I, Special Agent David Keith, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

### Count One

Beginning on or about August 9, 2007, and continuing until on or about August 10, 2007 at Chicago, in the Northern District of Illinois, Eastern Division, defendant

did attempt to commit extortion affecting commerce, in that he attempted to obtain and obtained United States currency from another person, with that person's consent induced under color of official right, and by the wrongful use of fear of economic harm;

in violation of Title 18 United States Code, Section 1951.

### Count Two

On or about August 17, 2007, at Chicago, in the Northern District of Illinois, Eastern Division, defendant

did attempt to commit extortion affecting commerce, in that he attempted to obtain and obtained United States currency from another person, with that person's consent induced under color of official right, and by the wrongful use of fear of economic harm;

in violation of Title 18 United States Code, Section 1951.

### Count Three

Beginning on or about October 2, 2007, and continuing until on or about October 4, 2007, at Chicago, in the Northern District of Illinois, Eastern Division, defendant

did attempt to commit extortion affecting commerce, in that he attempted to obtain and obtained United States currency from another person, with that person's consent induced under color of official right, and by the wrongful use of fear of economic harm;

in violation of Title 18 United States Code, Section 1951.

I further state that I am a <u>Special Agent of the Federal Bureau of Investigation</u> and that this complaint is based on the following facts:

**See attached affidavit**

Continued on the attached sheet and made a part hereof:  __**X**__ Yes  __ No.


_____
Signature of Complainant


Sworn to before me and subscribed in my presence,


<u>July 22, 2008</u>_____  at
Date

<u>Chicago, Illinois</u>_____
 City and State


<u>Michael T. Mason, U.S. MAGISTRATE JUDGE</u>
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT

I, David D. Keith, being duly sworn, depose and state:

1.    I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately five and a half years, having been assigned to the Chicago office for two years and the Oklahoma City office for three and a half years. My employment with the FBI has vested me with the authority to investigate violations of Federal Laws, including Title 18, United States Code, Section 1951.

2.    I, along with other FBI Special Agents and task force officers, have been conducting an investigation regarding violations of mail fraud, Title 18, United States Code, Sections 1341 and 1346; wire fraud, Title 18, United States Code, Section 1343; extortion, Title 18, United States Code, Section 1951; and racketeering laws, including Title 18, United States Code, Sections 1962(c) and (d). I am familiar with the facts and information contained in this Affidavit, which is based on my own personal observations, witness interviews, interviews of cooperating witnesses ("CWs"), review of consensually recorded conversations, analysis and review of documents and records, and from discussions with, among others, other FBI Special Agents, Chicago Police Department ("CPD") - Internal Affairs Division ("IAD") investigators, and Internal Revenue Service ("IRS") Special Agents.

3.    This Affidavit is made in support of a criminal complaint charging MICHAEL J. CIANCIO ("CIANCIO") with violations of Title 18, United States Code, Section 1951,

1

because he did attempt to commit extortion affecting commerce, in that he attempted to obtain and obtained United States currency from another person, with that person's consent induced under color of official right, and by the wrongful use of fear of economic harm.

4.      Since this Affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe CIANCIO committed violations of Title 18, United States Code, Section 1951.

## I.      BACKGROUND

5.      In 2003, FBI special agents in Chicago began an investigation into the extortion by, and bribery of, CPD officers in various CPD police districts within the City of Chicago, Illinois. Based on information provided by CWs, and complaints received by the CPD-IAD, the FBI learned that certain tow truck companies and their drivers operating in Chicago made bribe payments to CPD officers in return for receiving the towing business of vehicles from accident scenes. Bribes included cash payments of $50 to $400 per vehicle tow, and also included auto repair work and other services given to CPD officers by towing business operators.

6.      Based on information from a cooperating witness, CW6,  as well as other investigation to date, it has been determined that on-duty CPD officers solicited and accepted money in return for ensuring that specific tow companies and tow company employees

received the work of towing vehicles from accident scenes occurring in their CPD districts,

including CIANCIO in CPD's 16th[1] district. CIANCIO accepted bribe payments in the form

of cash and vehicle repairs to CIANCIO's vehicle. Furthermore, CIANCIO contacted CW6

via a cellular telephone when an accident scene was assigned to CIANCIO, in order for CW6

to respond to the scene first, and CIANCIO did not allow other tow companies to receive the

tow business. According to CPD general rules and regulations, specifically Rules 45 and 46,

CPD officers are prohibited from recommending any commercial or professional service

(Rule 45) or advising any person engaged in a professional or commercial service that any

commercial or professional service may be needed (Rule 46). Therefore, these rules prohibit

CPD officers from recommending that victims of vehicular accidents utilize specific towing

companies, and prohibit the officers from contacting towing businesses regarding potential

business at vehicle accident scenes.

    7.    Through consensually recorded conversations between CIANCIO and CW6,

and other sources of information, agents learned that CIANCIO kept track of the number of

vehicles CW6 towed from the accident scenes to which CIANCIO was assigned.[2] According

---

[1] The CPD 16th District is also known as the Jefferson Park District, and its station is located at 5151 N. Milwaukee Avenue, Chicago, Illinois. The CPD boundaries for the 16th District are roughly: Belmont Avenue on the south, Higgins, Howard and Touhy Avenues on the north, River Road and Canfield on the west and Cicero Avenue on the east.

[2] At various points in the Affidavit, I will offer my interpretations of certain intercepted conversations/meetings in brackets and otherwise. My interpretations of these conversations are based on my knowledge of the investigation to date and review of prior interceptions, the contents and context of the conversations, prior and subsequent conversations, the results of physical surveillance, conversations with other officers and agents, and my experience and familiarity with these types of investigations generally. Moreover, the voice identifications for the conversations set out below are preliminary. The identification of some individuals involved

3

to CW6, CIANCIO kept a running tally by writing down the number of vehicles in a ticket book CIANCIO kept in his CPD squad car. CIANCIO allowed CW6 to tow vehicles at accident scenes and in return CIANCIO demanded compensation from CW6 in the form of money and vehicle repairs.

## II.    PROBABLE CAUSE

### A.    CW6

8.    CW6 is a tow truck driver and owner of a towing business operating in the Chicago area.[3] Prior to his/her cooperation in this investigation, CW6 admitted that he/she had made payments to CPD officers in the 16th and 17th CPD districts for more than 15 years. According to CW6, the payments were made to CPD officers in exchange for the right to tow vehicles from accident scenes controlled by the officers. CW6 has not received any monetary compensation for the information he/she has provided to law enforcement in this investigation. Although no promises have been made to CW6, in exchange for the information he/she provided, CW6 hopes to obtain a benefit from the United States Attorney's Office relating to recommendations about charges which could be filed against

---

in these conversations and meetings has not yet been completed. Some of these summaries do not include references to all the topics covered during the course of the conversations. In addition, the summaries do not necessarily include references to all statements made by the speakers on the topics that are mentioned. For these recordings, I have relied on draft – not final – transcripts of conversations.

[3] The vehicle tow lift mechanisms on CW6's tow trucks were produced by Jerr-Dan Corporation, located in Greencastle, Pennsylvania. In addition, CW6 has his/her tow trucks insured through UPAC Insurance Financing of Lenexa, Kansas. During the times relevant to this complaint, CW6 mailed a check on a monthly basis to UPAC. The insurance payments range between $700 and $1,200, depending on the number of tow trucks CW6 had insured.

CW6 based on his/her previous criminal activities, and/or sentencing recommendations.

9.     CW6 has the following prior arrests and convictions:

a.     a 1987 arrest for retail theft (disposition unknown); a 1990 arrest for a bond forfeiture warrant; a 1991 arrest for criminal damage to property (disposition unknown); a 1992 arrest for aggravated battery (disposition unknown); a 2001 arrest for battery/bodily harm (disposition unknown); a 2002 arrest for telephone harassment which was stricken with leave to reinstate; a 2003 arrest for possession of drug paraphernalia (stricken with leave to reinstate); and a 2003 arrest for possession of cannabis (disposition unknown); and

b.     a 1994 conviction for aggravated battery/ great bodily harm, for which CW6 was sentenced to four years incarceration.

10.     Before CW6 began cooperating with the investigation, CW6 towed vehicles from accident scenes which were assigned to CIANCIO, as well as other CPD officers.[4] CIANCIO required that CW6 pay CIANCIO for any vehicle tow that CW6 obtained through CIANCIO's assistance. CIANCIO provided vehicle tows to CW6 in various ways. On some occasions CIANCIO was assigned to, and in charge of, accident scenes at which he would order tow drivers from other companies to leave the scenes. On some occasions, CIANCIO ordered rival tow truck companies to leave vehicle accident scenes, even if the rival company had arrived first and had an agreement with the accident victim to tow the vehicle. On other

---

[4] All information about CW6's past dealings with CIANCIO is based on debriefing of CW6, unless otherwise noted.

occasions, CIANCIO simply telephoned CW6 to inform him/her of an accident scene and CW6 would arrive before tow drivers from other companies. CIANCIO telephoned CW6 when CIANCIO was en-route to an accident scene and directed CW6 meet him at the scene. CIANCIO assured the accident victims it was appropriate to allow CW6 to tow their vehicles. On some occasions, CIANCIO requested the dispatchers to send accident scenes to CIANCIO via the computer system instead of over the radio. This prevented rivals of CW6 from hearing the transmissions and responding to the accident scenes. Once at the accident scenes, CIANCIO often encouraged drivers to allow CW6 to tow their vehicles.

11.     In exchange for providing CW6 with vehicle tows, CIANCIO demanded a certain payment from CW6, typically once per week, which was loosely related to the number of vehicles CIANCIO had provided to CW6. CIANCIO kept track of the number of vehicle tows he provided to CW6, and CW6's company, in a traffic ticket book. According to CW6, CIANCIO demanded payment once per week by making a reference to the number of vehicles CW6 had towed. CIANCIO expected $100 for each vehicle he claimed CW6 had towed. In fact, however, CW6 often paid more than $100 per vehicle actually towed because CIANCIO typically inflated the number of vehicles above the number CW6 had actually towed. If CW6 refused to pay the amount demanded by CIANCIO, then CIANCIO would not allow CW6 to tow vehicles at CIANCIO's accident scenes. CW6 advised agents that he/she paid CIANCIO an average of $600 to $800 per week over a two-year period prior to CW6's cooperation in this investigation.

6

12.     CW6 advised agents that he/she towed vehicles from accidents to certain auto body repair shops with which CW6 regularly did business.  CW6 provided the auto body shop with the vehicle and a tow receipt.  CW6 received a flat fee for each vehicle he/she brought to the shop.  The flat fee covered the payment CW6 had to pay to CPD officers to get the tow.  CW6 referred to the flat fee as a "drop fee."[5]  The auto body shop also paid CW6 a percentage of the cost to repair the damaged vehicle in exchange for CW6 selecting the auto body shop.  The cost of repair was referred to as "the fix."  CW6 would receive ten to fifteen percent of "the fix."

**B.      June 19, 2007, Accident in Which CIANCIO Directed a Vehicle Tow to CW6.**

13.     On June 19, 2007, CW3[6] and an FBI agent acting in an undercover capacity as a tow truck operator ("UCA"), responded to an accident scene located near the intersection of Nottingham and Addison, in Chicago, Illinois.  CW3 wore a recording device and consensually recorded the conversations between CW3 and other individuals at the accident scene.  According to surveillance, a review of the recordings and the UCA, the following events took place: a) CW3 and the UCA were the first tow truck to arrive at the accident

_____

[5] CW6 refers to this fee as a "drop fee" because it is the fee paid by the auto body shop when a tow driver drops the vehicle at the auto body shop.

[6] CW3 is a tow truck driver and operates a towing business in the Chicago area. CW3 has been cooperating with this investigation since May 2007. CW3 has received monetary compensation from the FBI pursuant to a services agreement which provides compensation to CW3 for expenses such as the use of his/her tow truck, fuel, and the time CW3 devotes to the investigation. CW3 was arrested for battery three times in the 1980s and 1990s, and for aggravated battery/resisting a peace officer once in 1999. CW3 was convicted of disorderly conduct in 2006.

scene and obtained authorization from the driver of one of the vehicles involved in the accident to tow one of the vehicles – a Ford Expedition – to an auto body repair facility; b) CIANCIO, who was in a marked CPD patrol car bearing beat tag 1696, was the officer handling the accident scene; c) after CW3 hooked the Ford Expedition onto CW3's tow truck, the owner of the vehicle approached CW3 and told CW3 that his/her mom's brother was going to come and tow the vehicle and wanted CW3 to unhook his/her vehicle; d) CW3 told the owner of the Expedition that CW3 would unhook the vehicle, however there would be a charge for the hook-up; e)  the owner of the Expedition complained to CIANCIO about CW3 charging him/her to unhook his/her vehicle; f) CIANCIO told CW3 to drop the vehicle and to leave the scene, and CW3 replied, "I have [his/her] signature and I'm bringing it to an auto body shop;" and, g) CIANCIO replied, "You ain't bringing it nowhere, the [guy/gal] just told me [he/she] don't, [he/she] has someone coming, drop the truck, drop the car right there. Drop it, drop it, and get out of here, you don't belong here, get out, [he's/she's] got somebody else that's how the bullshit starts you know what I'm talking about. Drop it right there and get out or you will be locked up for soliciting that's all I can tell you."

14.    According to CW6, CIANCIO called CW6 and advised CW6 of this accident. At CIANCIO's direction, CW6 came to the scene of the accident.  Surveillance observed CW6 arrive with a tow truck, hook the Ford Expedition to CW6's tow truck, and tow the Ford Expedition away from the scene.

15.    Later on June 19, 2007, the UCA contacted the owner of the Ford Expedition

8

and identified himself/herself as the owner of the towing company to whom the Expedition owner initially gave permission to tow the Expedition. This conversation was consensually recorded by the UCA. During the conversation, the Expedition owner told the UCA that the police officer (CIANCIO) told the owner to tell CW3 to put the car down. The owner also stated that he/she assumed that the officer already had a tow company at the scene who worked with the owner's insurance company and that the towing company the officer recommended worked in the area where the accident occurred. The owner stated that he/she had the impression that the officer (CIANCIO) and towing company (CW6) knew each other. The Expedition owner stated, "He's [CIANCIO's] got this guy that's got whatever, so I listened to the copper."

### C.    August 9-10, 2007 Attempted Extortion.

16.    On August 9, 2007, at 11:43 a.m., CW6 received a consensually recorded telephone call from CIANCIO. During the call, CIANCIO said,[7] "I've got two non-driveables here, one's an 03 Dodge with Geico insurance, I don't know what the other guy's got, he's got a Toyota Celica." CW6 asked CIANCIO for his location, indicating he/she did not hear the accident on the police radio. CIANCIO told CW6, "That's why I'm calling you, I'm at School and 56 west." CW6 said, "Alright, I'm sending him [CW6's tow truck driver]

---

[7]  Voice identification for CIANCIO is based on the following: review by agents of recordings that capture both audio and video of CIANCIO speaking; CW6's identification of CIANCIO's voice captured in recorded calls and meetings based on CW6's prior relationship with CIANCIO; CW6's knowledge of CIANCIO's cellular telephone number based on CW6's repeated payment of the bill for that cellular telephone; and self-identification by CIANCIO during recordings.

now." At approximately 1:29 p.m., CW6 placed a consensually recorded telephone call to CIANCIO. CW6 and CIANCIO discussed the number of vehicles CW6 owed CIANCIO bribe payments for. CW6 said, "You know what, I forgot it, my old man is driving me nuts. I wanted to call you back though. Tomorrow alright?" CIANCIO said, "Ya, I'm inside tomorrow, but when I'm done, you know." CW6 told CIANCIO, "When you're done, I'll meet you by Oak Park by Belmont." CIANCIO agreed. CW6 said, "What is it? Five...right?" CW6 indicated "five" to refer to the number of vehicles which CIANCIO had referred to CW6 for towing and for which CIANCIO expected payment. CIANCIO said, "I thought we said six with that last one. With the black kid it was six. Ya, half a dozen right?" CW6 understood that CIANCIO meant that there were six vehicles which CIANCIO had referred to CW6.[8] CW6 told CIANCIO to call him/her when CIANCIO was off duty the next day.

17.    On August 10, 2007, at approximately 1:27 p.m., CW6 placed a consensually recorded call to CIANCIO. CIANCIO said, "I'm on my way home. Where do you want to do this? Meet by the house?" CW6 said, "You tell me, what ever you want. I'm at Forest Preserve Drive and Belmont. Where are you at?" CIANCIO replied, "I'm at Lawrence and Augusta and Nagle, by Eli's." CW6 said, "So, so right there at Belmont and Oak Park, this way I don't miss you." CIANCIO said, "Ok, I'll see you there." Prior to meeting with

---

[8] Agents have not been able to verify whether CW6 or CW6's company towed the 2003 Dodge with Geico insurance or the Toyota Celica from the accident scene described in the call referenced in paragraph 16, which occurred at 11:43 a.m. on August 9, 2007.

CIANCIO, agents met with CW6 and fitted him/her with an audio recording device. Agents

searched CW6 and his/her vehicle for U.S. currency and contraband with negative results

prior to providing him/her with $600 in pre-recorded funds for a payment to CIANCIO.[9]

18.    At approximately 1:37 p.m. on August 10, 2007, CW6 met with CIANCIO in

the parking lot of a Walgreen's, at the intersection of Oak Park and Belmont, in order to make

the $600 payment to CIANCIO. During that meeting, according to the surveillance video,

surveillance agents, a debriefing of CW6, and a review of the recording, CW6 walked up to

CIANCIO, who was sitting in the driver's seat of a parked black Oldsmobile, bearing Illinois

license plate XXX21[10], and they had a brief conversation. CW6 said to CIANCIO, "How's

it runnin? There's six tickets [$600] in there," which CW6 said as he/she handed the $600

to CIANCIO. After CIANCIO received the $600, CIANCIO said, "Beautiful." CW6

responded, "Let's get out of here, there's too many eye balls." At that time according to

surveillance and CW6, CW6 walked back to his/her tow truck and CIANCIO drove out of

the parking lot.

19.    At 1:48 p.m., CW6 placed a consensually recorded telephone call to CIANCIO

concerning the earlier payment. CW6 asked CIANCIO if he was, "Happy [if CIANCIO was

---

[9] On each occasion set forth in this Affidavit on which CW6 paid CIANCIO, agents searched CW6 and CW6's vehicle for contraband and United States currency prior to CW6's meeting with CIANCIO. If CW6 had a small amount of United States currency in his/her possession at the time of the search he/she was permitted to keep his/her currency.

[10] Any reference to a license plate number in this Affidavit will begin with "XXX" in order to preserve the anonymity of the individuals whose vehicles were involved in the accidents described in the Affidavit, and the same convention will be used for CIANCIO's vehicle. A check of Illinois Secretary of State database indicated XXX21 was registered to Michael Ciancio.

satisfied with the payment]?"   CIANCIO replied, "Very happy [the payment was satisfactory]."   At approximately 2:16 p.m., CW6 met with agents, who recovered the recording device and searched CW6 and his/her tow truck for the $600 in U.S. currency with negative results.

20.     A review of the CPD Traffic Crash Reports filed by CIANCIO prior to the payment, CW6's tow receipts for the same period, and statements to agents from CW6, reveals the following:

a.     On August 3, 2007, CIANCIO drafted and signed a CPD Traffic Crash Report involving a 1996 Honda Civic, license plate XXX4491, with State Farm Insurance. A tow receipt for CW6's company, dated August 3, 2007, reflects that CW6 towed the same vehicle.

b.     On August 7, 2007, CIANCIO drafted and signed a CPD Traffic Crash Report involving a 2006 Nissan four door, license plate XXX149, with Geico Insurance. A tow receipt for CW6's company, dated August 7, 2007, reflects that CW6 towed the same vehicle.

c.     On August 7, 2007, CIANCIO drafted and signed a CPD Traffic Crash Report involving a 1995 Ford, license plate XXX435, with State Farm Insurance.  A tow receipt for CW6's company, dated August 7, 2007, reflects that CW6 towed the same vehicle.

d.     On August 9, 2007, CIANCIO drafted and signed a CPD Traffic Crash Report involving a 1997 Plymouth van, license plate XXX2785, with State Farm Insurance.

12

A tow receipt for CW6's company, dated August 9, 2007, reflects that CW6 towed the same vehicle.

**D.    August 17, 2007, Attempted Extortion.**

21.    According to CW6, during the course of CW6's dealings with CIANCIO, CIANCIO and CW6 adopted a habit of meeting once per week to settle the amount of money CW6 owed CIANCIO for tows during the previous week. On August 17, 2007, at 1:21 p.m., CW6 placed a consensually recorded telephone call to CIANCIO. During the call, CW6 asked CIANCIO, "Where we at [what is the number of vehicles CIANCIO referred to CW6 to be towed from accident scenes during the previous week]. CIANCIO said, "Five...without anything else added on, I do not know what else." CW6 said, "That's fine, I did not know what it was." CIANCIO responded, "Just myself five and then whatever happened there I do not know [referring to an accident scene where CIANCIO was not present]." CW6 said, "I hear you."

22.    At approximately 2:05 p.m. on August 17, 2007, CW6 met with agents, who searched CW6 and his/her vehicle for U.S. currency and contraband with negative results. Agents fitted CW6 with an audio/video recording device and provided CW6 with $700 in pre-recorded funds to use as a payment to CIANCIO. At approximately 2:30 p.m., CW6 placed a consensually recorded telephone call to CIANCIO and told CIANCIO that CW6 was at CIANCIO's home, and asked CIANCIO if CW6 should drive to the front of CIANCIO's home. CIANCIO said that was fine. CW6 told CIANCIO, "I have five boxes

13

of nails and two boxes of the thin ones [CW6 meant that he/she had $700 to pay CIANCIO]."

CIANCIO said, "Alright, beautiful."

23.    Agents conducting surveillance in the area of CIANCIO's home observed CW6

drive to the alley behind the home.  Surveillance observed CIANCIO walk to CW6's vehicle

where CIANCIO appeared to have a short conversation with CW6.   The video recording

recovered from CW6 indicated the payment took place in the alley behind CIANCIO's

garage.  According to a review of the recording device worn by CW6 during the meeting

with CIANCIO, and the debriefing of CW6 after the meeting, CW6 handed CIANCIO a

napkin containing the $700 provided by agents, as CW6 said, "Yeah, there's four nails and

two what ever."  CIANCIO said, "Beautiful."  CW6 said, "I'll see you Monday."  CIANCIO

replied, "Yes, thank you."   Surveillance observed CIANCIO walk back into his garage.

CW6 drove away and met with agents, who recovered the recording device from CW6 and

searched CW6 and his/her vehicle for the $700 in U.S. currency with negative results.

24.    CW6 placed a consensually recorded telephone call to CIANCIO at

approximately 3:23 p.m., on August 17, 2007.  During the call, CW6 asked CIANCIO if,

"Everything was right?" [asking whether $700 was enough payment for the vehicles

CIANCIO allowed CW6 to tow the previous week in the 16th District] and CIANCIO said,

"Beautiful, thank you, I just turned it over to the electrician, exactly what you gave me, I gave

it to the electrician."  During the surveillance of the meeting earlier that afternoon, agents

saw that CIANCIO's home was undergoing construction.  At the time that CW6 handed

14

CIANCIO the $700, surveillance saw an electrician's van parked near CIANCIO's garage. CW6 said, "I just want to stay smooth, there is a lot of heat out here." CIANCIO said, "Thank you, I appreciate it."

25.     A review of the CPD Traffic Crash Reports filed by CIANCIO prior to the payment, CW6's tow receipts for the same period, and statements to agents from CW6 that CW6 towed the following vehicles, reveals the following:

   a.     On August 14, 2007, CIANCIO drafted and signed a CPD Traffic Crash Report involving a 2007 Ford Fusion, license plate XXX6642, with Geico insurance. A tow receipt for CW6's company, dated August 14, 2007, reflects that CW6 towed the same vehicle.

   b.     On August 14, 2007, CIANCIO drafted and signed a CPD Traffic Crash Report involving a 2004 Ford Focus, Michigan license plate XXX152, with Farm Bureau insurance. A tow receipt for CW6's company, dated August 14, 2007, reflects that CW6 towed the same vehicle.

**E.     October 2-4, 2007, Attempted Extortion.**

22.     On October 2, 2007, at 12:22 p.m., CW6 received a consensually recorded telephone call from CIANCIO concerning the number of vehicles CIANCIO had referred to CW6 for towing from CIANCIO's accident scenes, and for which CW6 owed payments to CIANCIO. CIANCIO said, "We had four [cars towed] from last time [two weeks before], and uh, two or three as of yesterday, one today was four [during the past week]. I think we're

at seven or eight [cars towed]. I got it written down somewhere." CW6 asked CIANCIO, "What is it?" CIANCIO said, "It is either seven or eight [cars towed]."

22.     On October 3, 2007, at 1:03 p.m., CW6 placed a consensually recorded telephone call to CIANCIO to discuss the number of cars for which CW6 owed CIANCIO payments. Following a discussion of a particular accident, CIANCIO said, "That brings us to ten [cars towed], if you can't do nothin' [make a payment to CIANCIO] today, let me know." CW6 said, "So for sure in the morning. First thing in the morning. I'll be ready because I'm gonna take a check and just cash it." CIANCIO replied, "Ten cars. Beautiful."

26.     On October 4, 2007, CW6 met with agents and was fitted with an audio/video recorder. Agents searched CW6 and his/her vehicle for United States currency and contraband and agents found $1 in United States currency. CW6 was provided $1,000 in pre-recorded funds to pay to CIANCIO. Surveillance was established near the 6800 block of North Oriole. According to surveillance and a review of the audio/video recording, at approximately 8:31 a.m., CW6 approached CIANCIO, who was in uniform and seated in the driver's seat of a marked CPD patrol car. According to CW6 and the video recording, CW6 leaned into the open driver's window and handed CIANCIO the $1,000 payment. CW6 said, "There's for you." CIANCIO replied, "Thank you."

27.     At approximately 8:32 a.m. on October 4, 2007, while CW6 was still at the patrol car window after paying CIANCIO, CW6 and CIANCIO discussed the number of towed cars CIANCIO gave to CW6. According to a review of the audio and video recording

16

the following events took place: a) CW6 asked about the number of vehicles and CIANCIO flipped through his CPD ticket book while talking to CW6; b) CIANCIO showed CW6 where CIANCIO marked the tows in his CPD ticket book; and, c) CW6 said, "The Lincoln from yesterday and the car you got this morning" and CIANCIO replied, "And the one yesterday on Austin." At 8:50 a.m., agents recovered the recording equipment and searched CW6 and his/her vehicle for the presence of the $1,000 in pre-recorded funds with negative results, except the $1 in United States currency CW6 had in his/her tow truck.

28.    On October 5, 2007, at 6:20 a.m., CW6 placed a consensually recorded telephone call to CIANCIO to tell CIANCIO that CW6 was short $100 after paying the $1,000 to CIANCIO. During the call, CW6 asked CIANCIO to search his CPD squad car for an extra $100. CIANCIO described the cash he was paid on October 4, 2007, by CW6, saying, "Yeah, cause there was two tens on top and I'm like, what's this? I thought it was one ten, and I looked at it, it was ten, ten, the rest were twenties, was one, and the rest, there was nine." CW6 said, "Yeah, then it was all big bills, right?" CIANCIO said, "Yeah." The bills provided to CW6 by agents on October 4, 2007, were two ten dollar bills, four twenty dollar bills, and nine one hundred dollar bills.

29.    A review of the CPD Traffic Crash Reports filed by CIANCIO during the two weeks prior to the October 4, 2007, payment, CW6's tow receipts for the same period, and statements to agents from CW6 that CW6 towed the following vehicles, reveals the following:

a.      On September 19, 2007, CIANCIO wrote and signed a CPD Traffic Crash Report concerning a 2007 Honda, license plate XXX3046. CW6's business issued a tow receipt for the same day for the same Honda.

b.      On September 28, 2007, CIANCIO wrote and signed a CPD Traffic Crash Report concerning a 2001 Chevrolet four door, license plate XXX3580. CW6's business issued a tow receipt the same day for the same Chevrolet.

c.      On October 3, 2007, CIANCIO drafted and signed a CPD Traffic Crash Report referencing a 2000 Lincoln, license plate XXX1805. CW6's business issued a tow receipt the same day for the same Lincoln.

d.      On October 3, 2007, CIANCIO wrote and signed a CPD Traffic Crash Report concerning a 2003 Buick, license plate XXX0932. CW6's business issued a tow receipt on the same Buick.

e.      On October 4, 2007, CIANCIO wrote and signed a CPD Traffic Crash Report concerning a 2005 Buick, license plate XXX217. CW6's company wrote a tow receipt on the same Buick.

30.     During the remainder of October 2007, CW6 continued to obtain tows from CIANCIO at vehicle accident scenes controlled by CIANCIO. At the direction of agents, CW6 stalled making payments to CIANCIO, who demanded to be paid by CW6. On October 18, 2007, at 1:27 p.m., CW6 received a consensually recorded telephone call from CIANCIO in which CIANCIO said, "You'll be around tomorrow?" CW6 replied, "For sure, it's like

normal, where we at ever?" CIANCIO said, "Fuck tonight. Nah, I just said, you told me

yesterday [CW6 would make a payment] for sure, for sure, for sure, you know..." CW6 said,

"Yeah but tomorrow's fine." CIANCIO said, "I didn't hear from you, I says what the fuck

happened, you know. I thought it was like Christmas and I looked under the tree, there was

no gift [CW6 had not paid CIANCIO]...know what I mean? I thought yesterday was the day.

You know, you told me for sure, for sure, don't worry about it, you know...relax." CW6

asked CIANCIO how many cars he/she received for which he/she owed CIANCIO payment,

and CIANCIO said, "Well, with the old lady today...with the old lady today, seven."

## V.     CONCLUSION

27.     Based on the aforementioned, I believe there is probable cause to believe that

MICHAEL J. CIANCIO attempted to commit extortion affecting commerce, in that he

attempted to obtain and obtained United States currency from another person, with that

person's consent, induced under color of official right, and by the wrongful use of fear of

economic harm in violation of Title 18, United States Code, Section 1951.

FURTHER AFFIANT SAYETH NOT.

_____
David D. Keith
Special Agent, Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO BEFORE ME
This 22nd day of July, 2008.

_____
Michael T. Mason
United States Magistrate Judge

19